STEWART v. STATE.

(In Banc. February 9, 1948. Suggestion of Error Overruled March 8, 1948.)

[33 So. (2d) 787. No. 36675.]

Geo. S. Neal, Jr., and E. B. Todd, both of Jackson, for appellant.

Greek L. Rice, Attorney General, by Geo. H. Ethridge, Assistant Attorney General, for appellee.

L. A. Smith, Sr., J., delivered the opinion of the court.

Appellant was convicted in the Circuit Court of the First Judicial District of Hinds County on an indictment charging him with the murder of Annie Mae Westerfield, in whose house he had been living. The overwhelming evidence in the case reveals a most cruel death of this woman at the hands of this appellant by repeated and

savage stabbing of her, while she was held by him helpless and prone upon the bed in her home. It was deliberate murder beyond all reasonable doubt, and the jury properly so found by its verdict. The Court sentenced appellant to be electrocuted.

We have also examined most carefully the instructions granted the State, and refused the defendant, and no error was committed in that regard in the trial court.

During the trial on the indictment the State introduced a witness by the name of Proctor, who had entered the room where the killing took place, during its progress, in response to the victim's screams. On cross-examination, he was asked by appellant's attorney, referring to appellant, "What was his condition? Did he seem to be himself, know what he was doing?" The answer was, "I don't know, sir. I ain't been knowing him long enough to know his ways." This same witness was further interrogated along this same line on further cross-examination, as well as to whether or not appellant had been drinking that day.

Another State's witness, Alma Pridgen, on cross-examination, was asked, "Did he (the appellant) seem to know what he was doing?" The answer was, "I guess he did, I just glanced up." "Did he talk all right?" She replied, "I didn't talk any with him."

The daughter of the murdered woman was put on the stand by the State, and on cross-examination for defendant his attorney asked her, "Did he seem to be at himself then?" She answered, "Yes, sir." "Q. He seemed to be all right?" "A. Yes, sir."

Dr. R. E. Williams, the surgeon, who sought by his skill, to save the life of the slain woman, also testified for the State, and after stating "I have seen some bad cases and cases usually appear to be the same. You always look for something different in medicine," he was asked on cross-examination, "It appeared to be the work of a maniac?" The Court sustained an objection to the question.

In a confession admitted into the evidence, appellant claimed that his mind went blank, and he remembered nothing of the stabbing. He also stated, ''Well I just tell you I had been drinking beer and my mind wavers and when I get angry I lose my head and I just don't know what took place.'' In the direct examination of appellant, at the trial, by his attorney, a great many questions were prefaced by ''if you remember.'' One question was, ''What was the matter with you, you remember?'' He replied, ''I couldn't tell; everything was blank to me.'' And another time he answered, ''I couldn't say why, unless by the fight going on, the uprising of the pressure blood caused it, or what caused it, I couldn't tell. All I know they told me I did stab her.'' He also on cross-examination told the District Attorney, ''I don't understand things at all times, no way.'' ''What is the matter with you?'' ''I don't know, sir.''

The above excerpts from the evidence are inserted here, as bearing upon the question of diligence in the matter of the defense on the basis of appellant's mental condition, and as disclosing that appellant and other witnesses were actually interrogated as to same on the original trial, resulting in his conviction of murder. There was enough suggestion in the questions and answers in the trial on the merits, in our judgment, to justify a motion for continuance, or stay of the trial, long enough to allow investigation of appellant's criminal responsibility more thoroughly. Even though the motion were overruled, the record would have reflected this step as an act of diligence, now absent therefrom. Counsel were appointed by the Court, and made a a hard fight for their client, but we believe that insufficient diligence was shown to sustain the motion for a new trial on the ground of newly discovered testimony.

After the trial, the attorneys for the appellant filed an unsworn motion for a new trial, alleging therein over their signatures, that ''The attorneys for this defendant, have since the trial discovered evidence of the insanity

of the defendant which existed prior to trial and at this time, which insanity was unknown to attorneys for the defendant until after the trial.'' This motion was not sworn to by the attorneys or appellant. Accompanying this motion was an affidavit signed by several persons, ''That each of affiants have reason to believe, and do believe, that in March, 1947, and for many months prior thereto, and at the present time, the said William Stewart is insane, . . . incapable of forming any criminal intent and totally irresponsible for his wrongdoing; that we affiants, did not disclose this information to the attorneys representing said Stewart until after the trial of the said Stewart for the murder of the said Annie Mae Westerfield.'' This affidavit was dated June 17th, and filed June 18th, 1947. The jury verdict of guilty and the court's judgment of sentence were entered June 13th, 1947, and about one month later the Circuit Judge heard the witnesses on the motion for a new trial, which motion he overruled.

The witnesses were heard on the issue of insanity, at the hearing on the motion for a new trial, the inquiry having been addressed to the question whether or not appellant knew right from wrong at the time he slew the deceased woman. No complaint was made that appellant's mind was impaired at the time of the trial, and hence that he could not assist his attorneys to prepare and present his defense. Some of the witnesses testified he did not know the difference between right and wrong, some that he did, and some did not commit themselves. All of the witnesses for appellant, at the hearing on the motion for a new trial, testified to acts of his incorrigibility as a child, his previous acts of violence, (one such act being shooting at his own father for a denial to him of money by the parent), recklessness, and eccentricities in behaviour and matters of religion. Some of the acts which he produced as evidence to support his claim of criminal incapacity were merely antics of showmanship whereby he strutted his stuff before his fellows. It is

criminal responsibility which concerns us here, not mere mental abberations or quixotics of personality. He was shown to have been spoiled in childhood, cruel, quarrelsome, a drunkard, and bully. He was unquestionably egocentric. All of the acts on which his witnesses based their testimony were known to appellant, because he committed them. Hence, he could not go on the stand and make oath that he did not know of such acts until after the trial. His attorneys did not appear as witnesses and testify that the facts were not known to them until after the trial.

The State introduced the Hinds County jailer, who testified that as jailer he had opportunity to observe the appellant, and that he acted as normal as any other prisoner in the jail, and that he had had no report of unusual conduct or misconduct on his part.

The State also introduced a psychiatrist, Dr. Sheffield, who had a short interview with appellant about a week or ten days before the trial, and to him, without objection, there was read portions of the testimony delivered by appellant at his trial on the murder charge. Dr. Sheffield gave it as his opinion that if appellant had or had been suffering from any kind of mental disease, it was or would be of the emotional type, during which he would have tantrums. But that at the time of the slaying, the appellant knew that his act was wrong, and that he knew the difference between right and wrong.

The trial judge heard the conflicting proof, had the witnesses before him, and the question was patiently heard and considered. The motion for a new trial was correctly overruled, we think. We cannot say that he was manifestly wrong.

Logan v. State (Miss.), 40 So. 323, was a case where the appellant was interrogated at the trial on the merits concerning the matters set up in the motion for a new trial, and the motion for a new trial was overruled, largely for that reason. We affirmed the judgment of the lower court.

The motion for a new trial on the ground of newly discovered evidence must be supported by the affidavit of the defendant and his attorney, showing diligence with reference to discovery of evidence, and that such evidence was unknown to them at the time of the trial. Magee v. State, 154 Miss. 671, 122 So. 766. There is no such affidavit here. Futhermore, an accused asking for new trial for newly discovered evidence must satisfy the court that evidence had come to his knowledge since trial, that it could not have been discovered sooner by diligence, and that such evidence would probably produce a different result, if new trial should be granted. Carraway v. State, 167 Miss. 390, 148 So. 340. See also Odom v. State, 172 Miss. 687, 161 So. 141, and the authorities there cited. Grady v. State, 158 Miss. 134, 130 So. 117; Cooper v. State, 194 Miss. 592, 11 So. (2d) 207. The burden of proof on a motion for a new trial is on the movant. McKnight v. State, 171 Miss. 152, 157 So. 351.

As set out, supra, neither the attorneys nor the appellant filed an affidavit as required by law. The mere unsworn motion, signed by the attorneys, was not enough. In absence of the affidavit, neither the appellant nor the attorneys testified at the trial of the motion for a new trial, as required by the decisions of this Court in such situation. Furthermore, the record shows that appellant and other witnesses had been interrogated at the trial as to the matter involved in the motion for a new trial. Finally, on a motion for a new trial on the ground of newly discovered testimony the burden is on the movant, and it is also incumbent upon movant to convince the court that such testimony is relevant, competent, and would probably produce a different verdict from the jury on a new trial. We do not believe the evidence, if it had been introduced in the original trial, would have induced a different verdict.

Failure of the attorneys and of the defendant to furnish their own sworn evidence that they did not earlier know

of the facts offered on the motion for a new trial, was not only an error of procedure, but it caused the judge to be without adequate proof of a matter vital to the right of the accused to a new trial, as held by all of our decisions. But we do not have to base our conclusion here solely on that omission to comply with a fundamental rule. As heretofore stated, we are convinced that the evidence offered on the motion, if it had all been heard by the jury on the original trial, would have affected the jurors as it did the Circuit Judge, and us, and a verdict of guilty as charged would have resulted notwithstanding such evidence.

Defendant formed a motive to murder his victim as vengeance because she had him arrested previously, and murdered her pursuant thereto. He concocted the justification of self defense, frustrated when the officers failed to find the shovel he claimed she used, and by other circumstances. Whereupon, he took refuge in that not infrequent pretense of a "black out" of consciousness at the moment of the murder. This mental device is well known to penologists and administrators of criminal law the country over, and is rarely successful. But appellant attempted it himself here, and in keeping with manifest intelligence in the rest of his evidence his assertion of it was not incongruous and offered no evidence of a disordered mind, unaware of the consequences of his criminal act, and ignorant of the difference between right and wrong. So, another jury, we think, would merely bring in the same verdict, and a reversal would be merely shadow boxing with the processes of justice with no resulting justification thereof. Therefore, we are constrained to approve the action of the Circuit Judge overruling the motion for a new trial.

We have gone into this matter most carefully in a desire that appellant may have a thorough consideration of his claims here. We have reached the conclusion, as stated, supra, that the Circuit Judge did not err in over-

ruling the motion for a new trial. The judgment of the trial court is affirmed and Friday the 26th day of March, 1948, is designated as the date of the electrocution of appellant in expiation of his crime.

Affirmed.